UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ARRMAZ PRODUCTS INC.,

     Plaintiff,

     v.

RIETH-RILEY CONSTRUCTION CO.
INC.,

     Defendant.

Case No. 3:23-CV-00778-GSL-SJF

## OPINION AND ORDER

On August 21, 2023, Plaintiff, ArrMaz Products Inc., filed this action against Defendant,

Rieth-Riley Construction Co., Inc., alleging infringement of United States Patent Nos. 7,802,941

(the "'941 Patent") and 8,465,843 (the "'843 Patent") (collectively "the asserted patents"). [DE

1]. The asserted patents relate to surface-paving technology.

Before the Court is the issue of claim construction. [DE 60]; *see* N.D. Ind. L.P.R. 4-1.

The parties have completed briefing, and their submissions included an expert declaration and

deposition testimony. [DE 46-1]; [DE 49]; [DE 50]; [DE 56]; [DE 57]. The Court held a claim

construction hearing on October 15, 2024. [DE 74]; *see* [DE 80]. Having considered the

arguments and evidence presented by the parties in their written submissions and at the October

15, 2024, *Markman* hearing, the Court issues this Order.

## I.     BACKGROUND OF PATENTS

The asserted patents are directed to surface-paving technology. The patented technology

is used to "apply a coating on a surface to extend [its] life without wholesale replacement." [DE

50, page 2]. Specifically, the '941 Patent is directed to a "rut resistant coating" and the '843

Patent is directed to a "crack resistant coating." [DE 49, page 1]. These coatings are commonly applied by spray pavers. [*Id.*].

Surfaces, like roads and parking lots, can develop rutting[1] and cracking over time. [DE 50, page 1]. Such deformations are a "form of distress," which may lead to structural issues in the roads and impact the quality of driving. '941 Patent, 1:28–39. The asserted patents, and related prior art, offer the solution to "apply a coating on a surface" rather than "wholesale replacement" of the surface. [DE 50, page 2]. The asserted patents, specifically, address "a need for a method to efficiently create a surface coating having crack and rut resistant properties . . . to extend the life of the surface coating . . . while still maintaining stability of the surface coating to allow the safe travel of traffic." '941 Patent, 2:64–3:02. *See* '843 Patent, 2:66–3:04.

## II.    LEGAL PRINCIPLES

### 1.   Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed Cir. 2004). Courts are responsible for the construction of claims, and terms of art within the claim, because the ultimate question of the proper construction of a patent is a question of law. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)). Even when evidentiary findings are involved or required, the construction of a claim term remains exclusively for the courts to determine. *Id.*

---

[1] "Rutting" refers to "permanent deformation . . . in an asphalt pavement surface." Chance Liley, *Rutting: Causes, Prevention, and Repairs*, ILLINOIS ASPHALT PAVEMENT ASSOCIATION (Feb. 2018), https://www.il-asphalt.org/files/9915/1820/9831/Chance_Liley_2017_SIUE.pdf.

Generally, courts should give claim terms their ordinary and customary meaning. *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." *Id.*; *see Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field."); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum." (quoting *DeMarini Sports, Inc. v. Worth*, 239 F.3d 1314, 1324 (Fed. Cir. 2001))).

To determine the ordinary and customary meaning of a claim term, as understood by a person of skill in the art, a court must look at intrinsic sources, such as "the words of the claims themselves, the remainder of the specification, [and] the prosecution history . . . ." *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116). In addition, a court may evaluate "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

First, a court should evaluate a claim term in the context of the claims themselves. *See id.* ("[T]he context in which a term is used in the asserted claim can be highly instructive."). In several cases, the Federal Circuit has found that "the use of a term within the claim provide[d] a firm basis for construing the term." *Id; see, e.g.*, *Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1374 (Fed. Cir. 2004); *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999). A court should not restrict its evaluation to just the context of the asserted claim, but

it should consider the term's usage in other claims in the patent too. *Id.* ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of the claim term."). Because terms are generally used consistently throughout the patent, special usages of a term or differences between claims can also be "a useful guide in understanding the meaning of particular claim terms." *Id.*

Second, a court should read a claim term "in view of the specification, of which they are part." *Id.* at 1215 (quoting *Markman*, 52 F.3d at 978); *see id.* at 1313 ("[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."). The Federal Circuit has held that the specification is always relevant to claim construction, is usually dispositive, and is the single best guide to the meaning of a disputed term. *Vitronics*, 90 F.3d at 1582. Further, the Federal Circuit has noted that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. In other words, the specification may demonstrate that the inventor intended a definition other than the ordinary and customary definition, or the inventor intended to limit the claim scope by intentional disclaimer or disavowal. *Id.*

Third, a court may look at intrinsic evidence beyond the patent itself—namely, the patent's prosecution history. *Id.* at 1317. The prosecution history, in part, represents a negotiation between the Patent Office and the applicant, and it provides evidence of how the Patent Office and the inventor understood the patent, claims, and specific claim terms. *Id.* It can also inform "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* However, because the prosecution history tracks an

"ongoing" negotiation, rather than the "final product" of that negotiation, the prosecution history is warranted less merit than the patent itself for claim construction purposes. *Id.*

In addition to intrinsic evidence, courts may also rely on extrinsic evidence in the claim construction analysis. *Id.* This includes "all evidence external to the patent and prosecution, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman*, 52 F.3d at 980). For instance, "expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. *But see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."). While extrinsic evidence may be helpful, it is typically "less significant than the intrinsic record in determining the 'legally operative meaning of claim language.'" *Id.* at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (citation omitted)). Nonetheless, courts have the discretion to admit such evidence in a claim construction analysis. *Id.* at 1319. "[I]n weighing all the evidence bearing on claim construction, the court should keep in mind the flaws inherent in each type of evidence and assess the evidence accordingly." *Id.*

### 2. Indefiniteness

Patent law also imposes a definiteness requirement for patent claims. *See* 35 U.S.C.A. § 112 (West) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). The Supreme Court has read Section 112 to require that "a patent's claims . . .

inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 911 (2014). Like claim construction, a definiteness analysis evaluates a patent's claims in light of the patent specification, prosecution history, and extrinsic evidence. *Id.* at 911–12; *see Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015) ("In the face of an allegation of indefiniteness, general principles of claim construction apply.") (quoting *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010)). Further, a determination of a claim's definiteness is made from the perspective of one of ordinary skill as of the time the patent application was filed. *Nautilus*, 572 U.S. at 911. The party challenging the patent's presumptive validity has the burden of proving indefiniteness by clear and convincing evidence and must demonstrate that "a skilled artisan could not discern the boundaries of the claim." *Accentra, Inc. v. Staples, Inc.*, 500 F. App'x 922, 930 (Fed. Cir. 2013) (quoting *Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008)).

"Terms of degree" are frequently subject to indefiniteness challenges. On remand from the Supreme Court in *Nautilus*, the Federal Circuit stated that "[c]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Biosig*, 783 F.3d at 1378 (quoting *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014)). Specifically, the Federal Circuit instructed lower courts to determine "whether the patent provides 'some standard for measuring the degree'" to satisfy the definiteness requirement. *Id.* (quoting *Enzo*, 599 F.3d at 1332). This balances Section 112's demand for clarity and "the inherent limitations of language." *Nautilus*, 572 U.S. at 909.

### III.    PLAINTIFF'S EXPERT TESTIMONY

Defendant argues that Plaintiff's expert's declaration should not be given any weight. [DE 49, page 13–15]. The crux of Defendant's argument is that Plaintiff's expert testimony is "conclusory" or "unsupported" by the record. [*Id.*]. The Court disagrees.

Plaintiff's expert has a Ph.D. in Civil Engineering, is a university professor of Civil Engineering, has worked in the construction industry for about 50 years, has published numerous journal articles and presentations relating to pavement design and asphalt technology, and has received numerous industry recognitions. [DE 46-1, ¶¶ 1–13]. He is unquestionably an expert in the technology field at issue here. Defendant concedes as much in its opening brief. *See* [DE 49, page 14 n.5] ("His technical testimony, however, about what the specification teaches . . . is based upon his 50 years in the industry may be considered."). The question is only whether Plaintiff's expert's conclusions are sufficiently supported by the record.

Plaintiff's expert declaration includes over 30 pages of substantive analysis. [DE 46-1]. The analysis is based off both professional knowledge and evidence in the record. [*Id.* ¶¶ 14–17]. This evidence includes the accused patents, all relevant excerpts from the prosecution history of each accused patent, prior art patents, technical reference books, prior art industry reports, and general dictionaries. [*Id.*]. On their face, the expert's conclusions are well supported by the record. Moreover, Defendant had the opportunity to depose Plaintiff's expert about his declaration and the evidence that he relied on. [DE 49-2]; [DE 49-3]; [DE 49-4]; [DE 49-5]; and [49-6]. The deposition transcripts do not reveal any material inconsistencies nor contradictions in the expert's opinions. [*Id.*].

Contrary to Defendant's assertion, the expert's opinions are comprehensive and supported by the intrinsic record. In other words, they are ripe for the Court's consideration.

Also, significantly, Defendant does not combat Plaintiff's expert with its own expert or other extrinsic evidence. Because Plaintiff's expert testimony is unrebutted, the Court must consider it in regarding how a person of ordinary skill in the art would understand the disputed claim terms. *See Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1367 (Fed. Cir. 2022) (holding that the lower court erred by ignoring unrebutted deposition testimony by an expert).

## IV.    INDEFINITENESS

Defendant argues that independent claims 1 and 13 of the '941 Patent, independent claims 2 and 4 of the '843 Patent, and all related dependent claims are invalid for indefiniteness.[2] [DE 49, page 6–13]. Specifically, Defendant's argues that the claims' use of the term "about," in the context of the rest of the patent and prosecution history, "fails to inform those skilled in the art about the scope of the invention with reasonable certainty." [*Id.* at page 8].

Plaintiff argues that none of these claims are indefinite and that Defendant incorrectly treats all the "about" claims the same. [DE 57, page 5–13]. In arguing that these terms are definite, Plaintiff separates them into two buckets for construction purposes. [*Id.*]. For the "less than about 11%" claim term, Plaintiff argues for a construction that excludes claim coverage of "11% or more."[3] [*Id.* at page 5]. For the other "about" claim terms, Plaintiff argues that no construction is necessary and that those claim limitations should be given their plain and ordinary meaning.[4] [*Id.* at page 9–13].

---

[2] Related dependent claims are claims 2–12 and 14–23 of the '941 Patent and claims 3 and 5 of the '843 Patent.

[3] Found in claims 1–23 of the '941 Patent.

[4] Found in claims 1–12 of the '941 Patent and 2–5 of the '843 Patent.

### 1. "Less than about 11%" term

#### a. *Analysis*

First, the Court considers whether this claim term is indefinite.

In *Cohesive Techs., Inc. v. Waters Corp.*, the Federal Circuit reviewed a similar claim limitation: "greater than about 30 μm." 543 F.3d 1351, 1368 (Fed. Cir. 2008). Finding the term definite and valid, the court stated:

> "[T]he word 'about' does not have a universal meaning in patent claims, and [its] meaning depends on the technological facts of the particular case." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed.Cir.1995). When "about" is used as part of a numeric range, "the use of the word 'about,' avoids a strict numerical boundary to the specified parameter. Its range must be interpreted in its technologic and stylistic context." *Id.* In determining how far beyond the claimed range the term "about" extends the claim, "[w]e must focus . . . on the criticality of the [numerical limitation] to the invention." *Ortho–McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1327 (Fed.Cir.2007). In other words, we must look to the purpose that the "about 30 μm" limitation serves, to determine how much smaller than 30 μm the average particle diameter can be and still serve that purpose. To be clear, it is the purpose of the limitation in the claimed invention— not the purpose of the invention itself—that is relevant. Thus, we ask what function the "about 30 μm" low-end limit on particle size plays in the operation of the claimed apparatus and method.

543 F.3d at 1368. The court reasoned that the patentee's clear intention, by using the modifier "about," was that the scope of the limitation "greater than *about* 30 μm" encompassed average diameters that were less than 30 μm, but still greater than *about* 30 um. *Id.* at 1368; *cf. Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1581 (Fed. Cir. 1995) ("The addition of 'approximately' which means 'reasonably close to,' eliminates the precise lower limit of [a] range, and, in so doing extends the scope of the range." (footnote omitted)). With that in mind, the court looked to the patent's specification to determine the "function of the low-end limit on particle size" for guidance on the claim's range. *Id.*

Looking at the patent's specification, the court found that the function of the low-end limit related to attaining a "desired turbulence." *Id.* In addition, the court determined, using data and variances described in the specification, that that the claim's scope definitively included diameters larger than 25.434 μm and smaller than 23.044 μm. *Id.* at 1370. But for diameters between, the court applied a "functional approach" because the specification did not provide sufficient guidance to draw a hard and fast numeric line. *Id.* In other words, for particles within this range, the court concluded that "about 30 μm" included "a particle of sufficiently large size to assure that a column containing the particle is capable of *attaining turbulence*," which is the described function of the low-end limit. *Id.*

Applying the analysis from *Cohesive Techs.* to this case, the Court finds that the claim term "less than about 11%" is likewise definite and valid. The Court's analysis focuses on the '941 Patent specification. The specification states that "[t]he binding material can be present in the binding material layer in an amount sufficient to allow the rut resistant coating to withstand movement and cycles of movement (i.e. flexing) without cracking or permitting rutting in the rut resistant coating." '941 Patent at 5:4–8. In other words, the function of the high-end limit—about 11%—relates to the ability of the coating to flex without cracking or rutting. The specification does not provide additional guidance. However, additional guidance is not needed. Just as *Cohesive Techs.* applied a functional approach to determining the low-end limit of particle sizes, this Court could do the same for determining the high-end limit of binding material. The function described in the patent specification provides sufficient guideposts for ascertaining the claim scope. *See Biosig*, 748 F.3d at 1378. Therefore, this claim term satisfies the Section 112 definiteness requirement.

Next, the Court will determine the proper construction of this claim term.

Plaintiff asks the Court to construe "less than about 11%" to mean "less than, *and not including*, 11%." [DE 57, page 5] (emphasis added). Plaintiff argues that "[e]ither through lexicography or disclaimer, [Plaintiff] defined this phrase to *exclude* claim coverage of rut resistant coatings having a binding material layer containing *11% or more* of the total binding material." [*Id.*] (emphasis added). After reviewing the patent's prosecution history, the Court agrees that Plaintiff properly disclaimed "11% or more" from the claim term's scope.

The prosecution history of a patent may inform "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would be otherwise." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83). To depart from the ordinary meaning of a claim term, a patentee must demonstrate that its "statements in the specification or prosecution history [] amount to a 'clear and unmistakable' surrender." *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009). But "[w]here an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Here, the ordinary meaning of the claim term—less than *about* 11%—would encompass ratios that were equal to or greater than 11%, but still less than *about* 11%. *See Cohesive Techs.*, 543 F.3d at 1368. But Plaintiff's statements during the prosecution of the '941 Patent amount to a "clear and unmistakable" surrender of the claim term's ordinary meaning. Specifically, Plaintiff's correspondence with the patent examiner made clear that Plaintiff intended to exclude "11% or more" from the claim scope.

During the prosecution of the '941 Patent, the patent examiner rejected the application for obviousness. [DE 46-5, ARRMAZ_0000144]. Among other reasons, the examiner asserted that a

certain prior art patent—the Bense Patent—teaches a ratio of *less than 11%* for binding material to binding layer. [*Id.*]. However, in response to the examiner, Plaintiff argued that the Bense Patent does not disclose this limitation anywhere and, in fact, "teaches away from *less than 11%* of the total binding material." [*Id.* at ARRMAZ_0000169] (emphasis added). Specifically, Plaintiff argues that the Bense Patent requires the binding layer to contain *at least 11%* of the total quantity of binding material used in the coating. [*Id.*]. Subsequently, the patent was issued, implying that the examiner accepted Plaintiff's argument. [*Id.* at ARRMAZ_0000192]. These statements by Plaintiff clearly demonstrate that it disavowed a claim scope of "11% or more" to overcome a rejection by the patent office, and ultimately achieve issuance of the patent.

Arguably, the patent itself supports the disavowal too.[5] The '941 Patent specification distinguishes the Bense Patent because of its binding layer's "higher asphalt content." '941 Patent at page 1, and 2:41–52. The Bense Patent teaches a claim for "said layer of binding material contain[ing] *at least 11 percent* . . . of the total quantity of bitumen[6] present in said surface coating." U.S. Patent No. 5,069,578 (the "Bense Patent") at 12:7–10. With that in mind, construing the claim term to exclude "11% or more" is supported by both the '941 specification and the prosecution history.

### b. *Court's Construction*

For the reasons set forth above, the term "less than about 11%" is definite, and is construed to mean "less than, and not including, 11%."

---

[5] Defendant argues that Table 1 of the specification reveals an embodiment with 11% binding material. [DE 49, page 10]. Considering how the specification distinguishes the Bense Patent from the '941 Patent, the Court is not convinced that the 11% data point in Table 1 is covered by any of the claims. Even if that was the original intention of the '941 Patent inventors, they clearly narrowed the claim's scope during the patent's prosecution.

[6] The '941 Patent refers to "bitumen" as an alternative name for "asphalt," which is the main component in the binding material. '941 Patent 3:54–58.

### 2. Other "about" terms

#### a. Analysis

Terms of degree are not fatal to a claim's definiteness. *See Biosig*, 783 F.3d at 1378. On the contrary, such words are commonly used in patent claims "to avoid a strict numerical boundary to the specified parameter." *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1360 (Fed. Cir. 2019) (quoting *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1360 (Fed. Cir. 2014)) (cleaned up). However, terms of degree must be accompanied by "objective boundaries" for persons of ordinary skill in the art in the context of the invention. *Id.* Either intrinsic or extrinsic evidence may be sufficient to demonstrate these objective boundaries. *Id.*; *see Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1344 (Fed. Cir. 2016) (affirming the rejection of indefiniteness arguments and noting that the district court only expressly relied on extrinsic evidence, even though the intrinsic record also supported its conclusion).

As previously discussed, a description of a claim limitation's "function" satisfies the definiteness requirement because it provides "objective boundaries" for a person of ordinary skill in the art to determine the scope of a claim. *See Cohesive Techs.*, 543 F.3d at 1368 (describing a "functional approach" for ascertaining the scope of "about" terms). So the relevant inquiry is whether evidence, extrinsic or intrinsic, describes the function of each of the other "about" terms that are challenged as indefinite. *Id.* After reviewing the record, the Court determines that each term's "function" is adequately described or ascertainable to satisfy this analysis.

The first group of the other "about" terms relates to time. Specifically, the patent claims a method in which an "aggregate mixture layer is disposed on the binding material layer in a

period of time *less than about* [*30*] [*20*] [*15*] [*5*] *seconds*."[7] The specification describes the function of this time limit: preventing the binding material from "run off" or "flow from" the existing surface. '941 Patent, 5:59–5:9. Further, Plaintiff's expert explained that a person of ordinary skill in the art would understand that the time limitation depended on the surrounding circumstances, as it related to "the function of preventing such runoff." [DE 46-1, ¶¶ 86–88]. For example, a person of ordinary skill in the art would adjust the precise timing based on "deviations in measurement techniques and/or equipment tolerances," "the speed of the equipment being used to deposit the respective layers," "any imprecision in timing the respective placement of layers," and amorphousness or non-uniformity in the layers. [*Id.*].

The second group relates to shot rates.[8] Specifically, the patent claims a method in which "binding material . . . is applied on the existing surface in an amount of . . . *less than about* [*1.81*] [*1.38*] [*0.72*] *l per sq. m.*"[9] The specification describes the function of the shot rate limitation to "allow the rut resistant coating to withstand movement and cycles of movement (i.e. flexing) without cracking and/or rutting." '941 Patent, 5:21–25. Further, Plaintiff's expert explained that a person of ordinary skill in the art would understand that the shot rate limitation depended on the surrounding circumstances, as it related to "help[ing] the coating withstand one or more of flexing, cracking, and rutting." [DE 46-1, ¶¶ 91–93]. For example, a person of ordinary skill in the art would adjust the shot rate based on equipment limitations, differences between actual

---

[7] "[L]ess than about 30 seconds" in Claims 1–23 of the '941 Patent. "[L]ess than about 20 seconds" in Claims 2 and 21 of the '941 Patent. "[L]ess than about 15 seconds" in Claims 3 and 22 of the '941 Patent. "[L]ess than about 5 seconds" in Claims 4 and 23 of the '941 Patent.

[8] "Shot rates" refer to "the amount of binding material . . . disposed on the existing surface." '941 Patent, [5:35–37]. The specification also refers to this as "binding material rate." *Id.*

[9] "[L]ess than about 1.81 l per sq. m" in Claims 8 and 16 of the '941 Patent. "[L]ess than about 1.38 l per sq. m" in Claims 9 and 17 of the '941 Patent. "[L]ess than about 0.72 l per sq. m" in Claims 10 and 18 of the '941 Patent.

shot-rate and the inputted value on paving equipment, inconsistencies between different spray nozzles, and variable surface conditions. [*Id.*]. Plaintiff's expert also referenced several external sources—two of which were introduced by Defendant. [*Id.* ¶¶ 94–97]; *see* [DE 46-10] (Louisiana Transportation Research Technical Assistance Report No. 12), [DE 46-11] (NovaChip Surface Treatment Six Year Evaluation), and [DE 46-12] (Contract No. R-42219-A). Plaintiff's expert asserted that each source acknowledges discrepancies between expected and intended shot rates. [DE 46-1, ¶¶ 94–97]. Further, each supports the idea that a person of ordinary skill in the art would understand that shot rates have inherent variability, and adjustments must be made to account for these variable circumstances. [*Id.*].

The third group relates to air voids. Specifically, the patent claims a coating in which "the percentage of air voids filled with the first and second binding material is *greater than about* [*15%*] [*18%*]."[10] The specification describes the function of this limitation to "increase crack resistance" by "providing additional asphalt at the bottom of the aggregate mixture layer resisting the creation and propagation of cracks." '843 Patent, 8:12–16. The specification references an industry standard for calculating the percentage of filled air voids: ASTM D 3203. '843 Patent, 8:7–13. This standard, as discussed by Plaintiff's expert, acknowledges variability in its computation based on the test methods used to calculate certain variables. [DE 46-1, ¶ 122]; [DE 46-13, ARRMAZ_0003858] (ASTM D 3203 excerpt). Further, Plaintiff's expert explained that a person of ordinary skill in the art would understand that the air void percentage limitation depended on the surrounding circumstances, as it related to "the function of increasing [crack] resistance." [DE 46-1, ¶ 120]. For example, a person of ordinary skill in the art would understand

---

[10] "[G]reater than about 15%" in Claim 2 of the '843 Patent. "[G]reater than about 18%" in Claim 3 of the '843 Patent.

that a target value for air void content is not precise, due to the nature of asphalt-aggregate mixtures not having a uniform distribution. [*Id.* ¶¶ 121–22]. *See* [DE 46-14] (Yoder Publication) (cited by Plaintiff's expert to explain that "the properties, such as layer thickness, of asphalt roadways and coatings are not typically uniform or consistent").

   The fourth group relates to the height of "a substantially voidless layer."[11] Specifically, the patent claims a coating "wherein the depth flooded with the first and second binding material is *greater than about* [*0.38 cm*] [*0.46 cm*].[12] The specification describes the function of this limitation to "achieve a crack resistant coating hereby defined as the height of the Substantially Voidless Layer." '843 Patent, 8:29–32. As described in the patent, this claim limitation is directly related to the one relating to air voids, previously discussed (third group). The same industry standard (ASTM D 3203) provides a formula for calculating the height of the "substantially voidless layer," and the height is directly proportional to the percentage of air voids filled. '843 Patent, 8:60–9:17. This means that this claim limitation is subject to the same variability and tolerances as those for the air voids limitation. Further, Plaintiff's expert repeats his same conclusions, and cites the same external references, for this limitation too. [DE 46-1, ¶¶ 128–129].

   The function of these other "about" terms is adequately described in the patent specification. The Court independently finds that the described functions provide sufficient guideposts for ascertaining the claim scope for each "about" term. Further, Plaintiff offered credible extrinsic evidence that supports this proposition. Defendant does not offer any

---

[11] The "substantially voidless layer" forms after binding material fills some of the air voids in the aggregate mixture. '873 Patent, 3:38–32.

[12] "[G]reater than about 0.38" in Claim 4 of the '843 Patent. "[G]reater than about 0.46" in Claim 5 of the '843 Patent.

contradictory evidence and otherwise fails to establish by clear and convincing evidence that a person skilled in the art would not know with reasonable certainty the scope of these other "about" terms. Therefore, these claim terms satisfy the Section 112 definiteness requirement.

### b. Court's Construction

For the reasons set forth above, the other "about" terms are definite, and are given their plain and ordinary meaning.

## V.   CLAIM TERMS IN DISPUTE

### 1. "Rut resistant coating"

Below are the parties' proposed constructions:

| Claim Term | Plaintiff | Defendant |
|---|---|---|
| "rut resistant coating" | "a dense bituminous coating mixture having an aggregate mixture, with or without fillers, and a binder material, wherein when compacted compacting results in an air void content that is less than about 10% of the rut resistant coating" | "a multi-layered covering for increasing resistance to high vertical and horizontal strains and high shear stresses spread over an existing surface (e.g., roads, streets, interstates, parking lots, airport runways, airport taxiways, and the like) such that when the covering has been spread over the existing surface, the existing surface resists rutting" |

### a. Analysis

The term "rut resistant coating" appears in two independent claims of the '941 Patent: claims 1 and 13. The former claim relates to a "method for applying a rut resistant coating." The latter claim relates to the "rut resistant coating" itself. Read in isolation, the language of these claims does not reveal any special meaning or definition for "rut resistant coating." So the Court will look to the specification instead.

The specification for the '941 Patent explicitly defines "rut resistant coating." It states that

> The rut resistant coating *is* a dense bituminous coating mixture wherein the aggregate mixture, with or without fillers, and the binder material when compacted results in a small air void content of the rut resistant coating. The small air void content is less than about 10% of the rut resistant coating."

'941 Patent, 3:43–48 (emphasis added). This definition closely mirrors Plaintiff's proposed construction for the claim term.

Defendant asserts that "limitations from the specification are not to be read into the claims." [DE 49, page 22] (quoting *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014); [DE 56, page 15]. This is a mischaracterization of the caselaw and a misquote from *Hill-Rom v. Stryker*. The proper quotation from the case states, "we do not read limitations *from the embodiments* in the specification into the claims." 755 F.3d at 1371 (emphasis added). But limitations to the invention—rather than particular embodiments—may be read into the claims, if they are properly described in the specification. *Id.* Such is the case with disclaimer or lexicography. *Id.* The *Hill-Rom* court notes that describing what the invention "'is,' 'includes,' or 'refers to'" manifests exclusions or restrictions that may be imported into the claim. *Id.* at 1373.

Contrary to Defendant's argument, the specification's definition for "rut resistant coating" does not refer to a specific embodiment. Instead, the definition is attached to the present invention, generally. *See* '941 Patent, 3:43–48 ("The rut resistant coating *is* . . . .") (emphasis added). The specification manifests a clear intent to specifically define "rut resistant coating." Therefore, the specification strongly supports Plaintiff's proposed construction.[13]

---

[13] Defendant also argues that Plaintiff's proposed construction ignores the limitations of claim 5. [DE 49, page 23]. This is incorrect. Dependent claim 5 requires a certain "compaction" step. Plaintiff's proposed construction includes a particular property for the coating if compaction occurs. But it does not require the compaction take place. Therefore, these are not inconsistent or a violation of claim construction axioms.

Defendant proposes its own construction of "rut resistant coating." But it is not supported by the patent's claims, specification, or extrinsic evidence. Instead, Defendant's proposed construction improperly imports limitations from the claim's preambles.

"In general, a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality' to the claim." *Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1367 (Fed. Cir. 2020) (internal citation omitted). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Id.* (internal citation omitted). Defendant argues that the preamble language "provides context in ascertaining the scope and meaning of the disputed claim phrase[] 'rut resistant coating' . . . ." [DE 56, page 17]. This Court disagrees. The body of claims 1 and 13 of the '941 Patent recites a structurally complete invention. *See id.* at 1367. The preamble's recitation, "to provide resistance to high vertical and horizontal strains and high shear stresses," only describes a characteristic and purpose of the invention. *See id.* The preamble does not provide essential structure or steps, and it does not give life, meaning, and vitality to the claim. So the preamble does not limit the claim scope.

Further, Defendant's proposed construction includes several limitations from preferred embodiments in the specification. This includes listing examples of existing surfaces: "e.g., roads, streets, interstates, parking lots, airport runways, airport taxiways, and the like." But as discussed above, it is improper to import limitations from the specification that describe only certain embodiments of the invention. *Hill-Rom*, 755 F.3d at 1371. Moreover, Defendant's construction includes several other limitations not found in the language of the claims or

19

specification, like "covering" and "multi-layered." The inclusion of these limitations is also improper.

### b. Court's Construction

For the reasons set forth above, the Court adopts Plaintiff's proposed construction, and the term "rut resistant coating" is construed to mean "a dense bituminous coating mixture having an aggregate mixture, with or without fillers, and a binder material, wherein when compacted results in an air void content that is less than about 10% of the rut resistant coating."

### 2. "Crack resistant coating"

Below are the parties' proposed constructions:

| Claim Term | Plaintiff | Defendant |
|---|---|---|
| "crack resistant coating" | Plain and ordinary meaning, no construction necessary | "a multi-layered covering for providing resistance to high vertical and horizontal movements and high shear stresses spread over a surface (e.g., roads, streets, interstates, parking lots, airport runways, airport taxiways, and the like) such that when the covering has been spread over the surface, the surface resists cracking" |

### a. Analysis

Whereas Defendant offers essentially the same construction for this term as for "rut resistant coating," Plaintiff argues that no construction is necessary for "crack resistant coating." Plaintiff argues that "[u]nlike 'rut resistant coating' in the '941 Patent, the intrinsic record [for the '843 Patent] ascribes no specific definition to 'crack resistant coating' . . . ." [DE 50, page 23–24]. But Defendant argues that this would impermissibly "leave the construction of ['crack resistant coating'] to the jury." [DE 49, page 24] (citing *Eon Corp. IP Holdings v. Silver Springs*

*Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) and *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008)).

The Court rejects Defendant's proposed construction for this term because of the same reasons it rejects Defendant's construction for "rut resistant coating." Namely, Defendant's proposed construction improperly imports limitations from the claim's preamble. *See Shoes by Firebug*, 962 F.3d at 1367. Defendant's proposed construction also improperly includes limitations from preferred embodiments in the specification and others that are not supported by the claims or the specification. *See Hill-Rom*, 755 F.3d at 1371. In addition, Defendant's proposed construction ignores the differences between independent claims 1 and 6 of the '843 Patent. Specifically, claim 6's preamble does not describe the coating "to provide resistance to high vertical and horizontal movements and high shear stresses." This description is only found in claim 1's preamble. Yet Defendant's proposed construction narrows the scope of both independent claims based off a single claim's preamble.

In rejecting Defendant's proposed construction, the Court does not automatically give the term its plain and ordinary meaning. *Eon Corp.*, 815 F.3d at 1320. Doing so may be inadequate "when the term has more than one ordinary meaning or when reliance on the term's ordinary meaning does not resolve the parties' dispute." *Id.* (citing *O2 Micro*, 521 F.3d at 1361). But in this case, neither of those circumstances exist. Defendant contends that the term "crack resistant coating" does not have an ordinary meaning. But it offers no evidence to support this assertion. Moreover, Defendant does not point to any other dispute between the parties that requires a special construction of the claim term. On the other hand, Plaintiff's expert testified that a person of ordinary skill in the art would understand a "crack resistant coating" to carry its ordinary meaning. [DE 46-1, ¶ 98]. Specifically, Plaintiff's expert points to a general definition in an

edition of Webster's Dictionary; he states that this is the meaning he applied throughout his evaluation of the case. [*Id.* at page 30 n.3]. Defendant offered no evidence to rebut this position.

### b. Court's Construction

For the reasons set forth above, the term "crack resistant coating" is given its plain and ordinary meaning.

### 3. "An existing surface" and "Surface"

Below are the parties' proposed constructions:

| Claim Term | Plaintiff | Defendant |
|---|---|---|
| "an existing surface" | Plain and ordinary meaning, no construction necessary | "the actual bounded area (e.g., roads, streets, interstates, parking lots, airport runways, airport taxiways, and the like) on which the claimed coating is to be placed" |
| "a surface" | Plain and ordinary meaning, no construction necessary | "the bounded area (e.g., roads, streets, interstates, parking lots, airport runways, airport taxiways, and the like) on which the claimed coating is to be placed" |

### a. Analysis

Defendant's proposed construction for each term is a list of examples of that term from the specification. [14] *See* '941 Patent, 3:27–29 ("Examples of existing surfaces include roads, streets, interstates, parking lots, airports runways, airport taxiways, and the like."); '843 Patent, 5:15–18 (listing the same for "a surface"). As previously discussed, embodiments from the specification do not limit the claim scope. *See Hill-Rom*, 755 F.3d at 1371 ("[W]e do not read

---

[14] At the October 15, 2024, *Markman* hearing, Defense counsel appeared to modify the party's proposed construction to omit "actual bounded" and "bounded." [DE 80, 165:5–13 and 166:16–19]. But even if that was not the case, the limitations "actual bounded" and "bounded" are not supported by the intrinsic record.

limitations from the embodiments in the specification into the claims."). Even if a patent describes only a single embodiment, the claim scope won't be restricted to such. *Id.* at 1372. For this reason, the Court rejects Defendant's proposed construction.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. Such is the case here. "Surface" and "existing surface" are not technical terms of art. Nothing in the claim language, specification, or prosecution suggests that these terms require a unique construction. *See Brown v. 3M*, 265 F.3d 1349, 1352 (Fed Cir. 2001) ("These are not technical terms of art, and do not require elaborate interpretation."). Further, Plaintiff's expert testified that a person of ordinary skill in the art would understand these terms to carry their ordinary meaning. [DE 46-1, ¶¶ 66–69, 103–06]. Specifically, Plaintiff's expert points to a general definition in an edition of Webster's Dictionary; he states that this is the meaning he applied throughout his evaluation of the case. [*Id.* at page 19 n.1 and 32 n.4]. Defendant offered no evidence to rebut this position.

### b. Court's Construction

For the reasons set forth above, the terms "an existing surface" and "a surface" are given their plain and ordinary meaning.

### 4. "Aggregate mixture" and "Aggregate mixture layer comprises aggregate and asphalt"

Below are the parties' proposed constructions:

| Claim Term | Plaintiff | Defendant |
|---|---|---|
| "Aggregate mixture" | "a mixture of at least aggregate particles, an asphalt solution, and optionally, a pulverulent material, wherein the asphalt solution binds the aggregate particles together" | "a mixture of aggregate particles, an asphalt solution, and optionally, a pulverulent material" |
| "Aggregate mixture layer comprises aggregate and asphalt" | "mixture layer of at least aggregates and asphalt wherein the asphalt binds the aggregates together" | "the aggregate mixture layer includes aggregate particles and asphalt." |

### a. Analysis

The crux of the parties' dispute is whether to include the language "wherein the [asphalt solution] [asphalt] binds the [aggregate particles] [aggregates] together" in the terms' constructions. Plaintiff wants it included, but Defendant does not.

In the '941 Patent, the specification supports Plaintiff's proposed construction. It states, "*[t]he asphalt solution is present* in the aggregate mixture in an amount sufficient *to bind the aggregate particles together* yet not destroy the structure and support provided by the aggregate mixture layer to resist rutting." '941 Patent 5:12–15 (emphasis added). Further, the specification attributes this feature to the invention in general, not just to specific embodiments. *See Hill-Rom*, 755 F.3d at 1373 (holding that a specification that describes what the invention "is" manifests exclusions that may be imported into the claim).

Plaintiff's expert asserted that the relationship between the components of the "aggregate mixture" is significant. [DE 46-1, ¶¶ 81–83]. Specifically, the expert stated that "[t]he patent makes clear that the asphalt solution mixes with the particles to bind the particles together to create a single mass that holds the aggregates in place as opposed to simply adding the components together in an uncontrolled manner." [*Id.*] And more importantly, that a person of ordinary skill in the art would understand the "aggregate mixture" to be as such. [*Id.*]

Contrary to Defendant's argument, construing this claim term to include "functional language" does not contradict Federal Circuit precedent, nor does it require the Court to "rewrite the claims." *See* [DE 56, page 19]. Defendant's reliance on *Chef America v. Lamb-Weston, Inc.* for this point is misplaced. In that case, the court was asked to construe a claim term requiring "heating the . . . dough at a temperature in the range of . . . ." 358 F.3d 1371, 1373. Chef America urged the district court to interpret the claim "to apply the heating requirement to the *place* where the heating takes place (the oven) rather than the *item* being heated (the dough)." *Id.* at 1373–74. Otherwise, Chef America argued that "the resultant product of such heating will be something that . . . resembles a charcoal briquet," i.e. a nonsensical result. *Id.* at 1374. Nonetheless, the district court's rejected Chef America's proposed construction. *Id.* The court reasoned that Chef America's proposal contradicted the claim's unambiguous language. *Id.* Thus, the court could not rewrite the claims, even to avoid a "nonsensical result." *Id.*

*Chef America v. Lamb-Weston* does not apply to this case. Here, Plaintiff's proposed construction does not contradict the unambiguous claim language. Plaintiff does not ask the Court to "rewrite" the claims. Instead, Plaintiff's proposed construction includes a characteristic of "the asphalt solution." This characteristic is described in the specification and is attributed the present invention, not specific embodiments. Therefore, Plaintiff's proposed construction for the '941 Patent term is supported by the record.[15]

In the '843 Patent, the specification does not support Plaintiff's proposed construction. It states that "*[t]he asphalt solution can be present* in the aggregate mixture in an amount sufficient

---

[15] Defendant also argues that Plaintiff's proposed construction ignores the limitations of claim 6. [DE 49, page 28]. This is incorrect. Dependent claim 6 requires the inclusion of "a pulverulent material . . . to produce a pasty layer to promote adhesion . . . ." But Defendant does not point to any evidence in the record to demonstrate that the "pulverulent material" is what "binds the aggregate particles together." To the contrary, the specification clearly identifies the "pulverulent material" as optional. '941 Patent, 4:12–14.

*to bind the aggregate particles together* yet not destroy the structure and support provided by the first aggregate mixture layer[].” ’843 Patent, 10:54–57 (emphasis added). The significant language here is “can be present,” which is repeated later in the specification too. *Id.* at 13:9–13 (“The asphalt solution *can be present* in the aggregate mixtures in an amount sufficient to bind the aggregate particles together yet not destroy the structure and support provided by the first aggregate mixture layer [] and the second aggregate mixture layer[].” (emphasis added)). This contrasts with the language in the ’941 Patent, which states that “[t]he asphalt solution *is present* . . . to bind the aggregate particles together . . . .” The logical conclusion is that this language in the ’843 Patent describes certain embodiments, rather than the invention generally. Based on only the specification, the Court cannot include this limitation in the claim construction. *Hill-Rom*, 755 F.3d at 1371 (“While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims.”).

Plaintiff points to the prosecution history for support, but the Court finds none there. Specifically, Plaintiff, and its expert, assert that a declaration by one of the ’843 inventors supports Plaintiff’s construction. *See* [DE 46-1, ¶ 111]. In this declaration, the inventor discusses the function of the asphalt in the invention, comparing it to “glue that holds the structural aggregate in place . . . .” [DE 46-6, ARRMAZ_0000674]. But the inventor appears to discuss this function only in the context of “hot mix production.” *Id.* (“Bare aggregates are used in *traditional hot mix production* . . . to form aggregate mixtures. These aggregate mixtures may be transported and applied . . . with minimal segregation. If not for the asphalt, the aggregate on its own will segregate and be uncontrolled.” (emphasis added)). The ’843 specification makes clear that “traditional hot mix production” or “hot-mix asphalt” is only one of several embodiments of

the '843 invention. *See* '843 Patent, 10:29–53 (discussing aggregate mixtures in "hot-mix asphalt," "warm mix," and "cold mix").

Defendant proposes its own construction for this term, but the Court does not adopt it either. A court's obligation to construe claim terms is limited to where there is a dispute over claim scope. *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1372–1373 (Fed. Cir. 2016). *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) ("[A] court need not attempt the impossible task of resolving all questions of meaning with absolute, univocal finality. Such an endeavor could proceed ad infinitum, as every word—whether a claim term itself, or the words a court uses to construe a claim term—is susceptible to further definition, elucidation, and explanation."); *see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."). Here, Defendant's proposed construction only redefines the word "comprising." This is unnecessary. "Comprising" is an often used word in patent drafting because it acts as a "signal[] to patent practitioners" that a claim is open-ended. *Id.* at 803. Explicitly defining this word does not affect the scope of the claim term. Therefore, the Court finds that no construction is necessary for this term.

### b. Court's Construction

For the reasons set forth above, the Court adopts Plaintiff's proposed construction for the '941 Patent term, or "aggregate mixture," and finds no construction is necessary for the '843 Patent term, or "aggregate mixture layer comprises aggregate and asphalt."

The '941 Patent term, or "aggregate mixture," is construed to mean "a mixture of at least aggregate particles, an asphalt solution, and optionally, a pulverulent material, wherein the asphalt solution binds the aggregate particles together."

The '843 Patent term, or "aggregate mixture layer comprises aggregate and asphalt," is given its plain and ordinary meaning.

## VI.    CONCLUSION

The Court adopts the constructions above for the disputed claim terms of the asserted patents. Furthermore, the Parties should ensure that all testimony that relates to the terms addressed in this order is constrained by the Court's reasoning. However, in the presence of the jury the Parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this memorandum that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

SO ORDERED.

ENTERED: May 6, 2025

/s/ GRETCHEN S. LUND
Judge
United States District Court